Good afternoon. Please, the Court, my name is Todd Grover. I represent Octavio Mendoza-Morales. Mr. Mendoza-Morales challenges the sufficiency of the evidence supporting four criminal convictions in this case. By way of introduction, what I intend to do today is to briefly discuss the standard that you will be applying in judging that challenge and to then, with respect to each count of conviction, explain why the government's evidence in this case was insufficient. I will, of course, answer any questions that you have, and because this is a fact-specific inquiry, it's my hope and request to reserve some time at the end to respond to the government's factual arguments. The standard is well known, I'm sure, to this Court. The question with respect to each count of conviction is whether, viewed in a light most favorable to the government, a rational prior effect could have found the crime of the charged offense beyond a reasonable doubt. Counsel, may I ask you if there is sufficient evidence to support the convictions on conspiracy? Doesn't that end your argument? It does, Your Honor, and I take from your question that you've thought about the fact that if, indeed, the government has proved the overall conspiracy alleged in Count 1, they can then obtain convictions on the substantive offenses through the Pinkerton theory of liability. And so that is correct, Your Honor. So much hinges, then, on the ---- And you didn't object to the conspiracy instructions that were given by the Court. That is correct, Your Honor. I did not represent Octavio Mendoza-Morales at the trial level, but trial counsel did not, in fact, object to the instructions. The motion for judgment of acquittal, as the Court is aware, was made at the conclusion of the government's case-in-chief. It was denied by the district court. Mr. Mendoza-Morales did not renew that motion at the end of all of the evidence. And as a result, there is some question as to the standard of review that this Court will apply in reviewing the district court's ruling. But it's not really the type of cases and challenge that you're raising, the sufficiency of the evidence, it's really the distinction between the standard of review is really meaningless. I think we've held that. I agree. I was going to say that, Your Honor, but thank you. Yes. The job of this Court remains the same. You have to review the evidence and determine whether it's sufficient. Moving, then, to count one, which is the overall conspiracy. As this Court is aware, the government charged Mr. Mendoza-Morales with a broad drug distribution conspiracy. The indictment alleged that between dates in 2003 and 2005, Mr. Mendoza-Morales conspired with his brother, Ricardo Mendoza-Morales, with Hector Velarruel, with Heriberto Montenegro, Jose Salinas, and others to distribute. Let me just interrupt. Factually, what is your best case that his conspiracy was limited to a conspiracy in agreement with his brother, Ricardo? Sure, Your Honor. The best evidence of that is the fact that, first of all, it is ---- Well, you take a second and think about that. I recognize that's not the standard. I still want to know what you're pulling out. Sure. Absolutely. The ---- if you look at the government's evidence overall that it introduced during its case-in-chief, it shows that Ricardo was distributing drugs, dealing drugs, selling drugs to a number of people to include my client. And the government, in fact, introduced into the evidence, and you have in the supplemental excerpts of record his drug ledger, which sort of lists, if you will, all of his various customers. My client is listed there by his nickname at the time, Shenate. The government then proceeded to investigate this case and develop this case through a wiretap. They got a tap on Ricardo's cellular telephone and listened to him as he's talking to his various drug customers, my client included. And when you view those wiretaps in total, what you see is that although Ricardo was talking to some of these various people, these various people aren't necessarily talking to each other. For instance, there's no concert of action between my client, Octavio Mendoza Morales, and, say, one of Ricardo's other customers, Mr. Vela Ruel, for instance. These are all independent customers who are buying drugs from Ricardo and turning around and doing other things with them. And as I've argued in my brief, Your Honor, my client was also, to a certain extent, not just a customer of his brother, but was also, if you will, an employee of his brother. He did the occasional odd job for his brother, and I don't mean to be flip about that. He would occasionally, at his brother's behest, sell drugs to other people. And I've conceded, as I will today again, that my client was involved in a two-man drug distribution conspiracy with his brother Ricardo, but that is pointedly not the conspiracy that's charged in Count 1. Well, but Octavio was certainly aware of the existence of Hector. Yes, Your Honor. And Hector, after the Mazda theft, Octavio told Ricardo that Guerrero was one of the And they were in a hidden compartment. And then Octavio's girlfriend testified that she saw Hector and Ricardo together with the Mazda. And then Octavio passed the Mazda to Hector, so Hector ended up with her. I mean, that's just one situation there. And then, as far as the beginning with Octavio, we had a conversation with Ricardo where Octavio said he'd loan Ricardo a half an ounce of meth for Negro. And Octavio then instructed Ricardo to send Negro over to his place and to have Negro call Octavio first. So that happened. So, I mean, you've got a lot of things here that show one kind of overall operation going and where the business, the illicit business they're carrying on involves a number of people. Isn't that enough, an overall conspiracy? With respect, Your Honor, I would say no. Yes, Your Honor, it is correct. There is ample evidence to suggest that my client Octavio knew and was acquainted with Hector and even to suggest that my client knew Mr. Villareal. And even that my client knew Mr. Villareal was involved in drug distribution of some sort with Ricardo, that he was one of Ricardo's other customers. But the critical fact, the critical element that the government did not prove is, you know, to do one of these overall drug conspiracies where you've got kind of what we call the wheel and the hub or the hub and the wheel conspiracy. You've got Ricardo as the hub and the center. You've got his various customers as the spokes going out. To prove the overall conspiracy, the government has to tie all of those customers together or bound them in a rim. And the rim that the government must prove is an overall agreement among these various customers to work together to accomplish some illicit act. In this case, what the government didn't do is they didn't show that these various customers derived some benefit from one another. Sure, they all got some benefit from their dealings with Ricardo. They either got drugs or they got drugs and sold drugs. Counsel, what case says that the co-conspirators, that the government must show that the co-conspirators received benefit from one another rather than from the scheme? Sure, Your Honor. It's a series of cases. Give me your strongest case to support that proposition. Sure, Your Honor. United States v. Martin. It's at 4 Federal 3rd 757. Decision of this Court in 1993. And it's – I believe it's cited in my brief, Your Honor. But as you will read, it also cites some – Now, I have that case. Would you point me to the language in that case that you rely upon to support your argument that the government must show that the co-conspirators derived benefits from each other? Which case are we talking about here? This is United States v. Martin. I'm sorry, Your Honor. U.S. v. Martin. Your Honor, I've got Martin open. I'm looking at a passage of law laid out on page 760 of the Federal 3rd. Right. But that language, you're talking – starting with it is sufficient to show? Yes, Your Honor, I am. Right. But it says there that each defendant had reason to believe that their own benefits were dependent upon the success of the entire venture. Sure. And that's why I asked you that question, because you said that the government had to prove that the co-conspirators benefited each other. What I believe the government has to show to support this conviction, Your Honor, is that my client, Octavio Mendoza Morales, that his benefit was dependent on someone other than just Ricardo. Because if they've shown that all he is depending on is Ricardo for his profit from this conspiracy, then all they've proven is a two-man conspiracy, and that's not what's charged. I think they've got to show more, Your Honor. But what Judge Rawlinson is, I think, correctly pointing out is not that their benefit from each other individual, but whether they benefit from – whether their benefit depends upon the success of the entire venture, which means the entire conspiracy, not any other particular individual. I do take your meaning of thank you. Thank you. You know, Your Honor, what I guess is I'm reading that passage or that rule. I'm also reading it in context with the prior sentence from that same decision where they talk about – where this Court talks about the fact that, you know, to support this conspiracy conviction, you've got to have an overall agreement and people carrying out various functions to facilitate that agreement. I think there has to be some sort of concert of action, and if all – again, I think that if all we show is that my client is relying solely on his interactions with Ricardo to support this conspiracy, then they haven't proven the overall conspiracy alleged here. That's my interpretation of this Court's law. What instruction are you thinking that was given? What instruction was given? Yeah. That you're thinking about and you make this argument. And it helps you. Sure. Your Honor, I believe the – you'll forgive me. I don't have the transcript right in front of me. And I should know this off the top of my head. My recollection was that the Court did instruct the jury at the time of sentencing on the – At the time of sentencing. Excuse me. I misspoke. At the conclusion of the trial, that the district court did instruct the jury regarding what is known as a variance or multiple conspiracy theory. That's a Model Ninth Circuit. But you don't – you don't argue that there was an error in instructing the jury regarding the elements of a conspiracy. I do not, nor would that argument have been preserved, Your Honor. But you don't make a new opinion. The judge didn't use the wheel type conspiracy theory. No, he did not. The classic sort of Claudiolus wheel type. That instruction was not requested and was not given. But I would suggest – That's the one you're talking about now. That is, Your Honor. I mean, that's how I – I think that's what the government's evidence suggests in terms of the organization, if you will, of the players in this case. Did you ever diagram the case? Did I ever diagram the case? Only in my mind's eye, Your Honor. Well, it reminds me of a story I heard in law school, but I don't want to embarrass you by relating it. I'm hard to embarrass, Your Honor. Your Honor, I would conclude with this. It's like in the old days, they used to ride the, I guess, the LARC from San Francisco to Los Angeles before airplanes were flying. And so the senior partner went with a junior partner on this LARC to L.A. And when they got to L.A., the senior partner asked the junior partner, have you brought the authorities with you? And the junior partner said, no, no, I've got them all in my mind. And so the senior said, next time we come down here, bring the authorities with you and leave your mind in San Francisco. Quite well taken. Thank you, Your Honor. That's when I learned in law school. I had my one case. I thought I was doing pretty well. Thank you very much. May it please the Court. Good afternoon. My name is Craig Gabriel. I'm an assistant U.S. attorney here in Portland. The defendant was convicted by a jury after ---- I have a question. Yes, Your Honor. Did you ever diagram this case? I did diagram this case, Your Honor. And the diagram in the case shows that the defendant ---- Have you got the diagram? I don't have it here with me, Your Honor. Judge Ferguson has a really good diagram. I don't know that the diagram is in the record, Your Honor. But ---- and I don't have it here. But ---- Were you trial counsel? I was trial counsel, yes, Your Honor. And ---- Where is it in the record? It's not in the record. I'm sorry, Your Honor. It's not in the record. But the evidence in the case does show ---- Was this ---- were you arguing a wheel-type conspiracy? We were not, Your Honor. The evidence showed that the defendants in the case were not only connected with the undisputed leader of the conspiracy, Ricardo Mendoza Morales, with whom the defendant concedes his client conspired, but that the defendants had direct criminal contact with each other, and they certainly were aware of the others in the conspiracy and were aware of the scope of the conspiracy. So each defendant had direct contact with another defendant. That is correct, Your Honor. All across the scope. That's right. That's right. So there was a spiderweb of sorts of contact between the co-conspirators in the case. Well, a spiderweb is not a rim, is it? It's not a rim, Your Honor. There was a multiple conspiracy instruction given in the case under the Ninth Circuit model instruction 8.17, and another defendant, not Mr. Mendoza Morales, but another defendant argued in closing arguments that he was part of a separate conspiracy. Mr. Mendoza Morales, the defendant here, did not make that argument. Do you know who Judge Trott is? No, Your Honor. It's unfortunate. I will look him up this afternoon. He's one of our judges in our court. Yes. An excellent judge, a former United States attorney, a former – well, he ran the DA's office in Los Angeles for years and years, and he was also head of the Justice Department in Washington. And he had his first trial before me when I was a municipal court judge, and I have great respect for him. And he is an advocate that you must diagram every prosecutor, every case. And he's written some very good law reviews on this, so I just commend that to all the lawyers present to read that. Well taken. Thank you, Your Honor. Because, you know, I was a trial judge for years, and so was Judge Wardlaw. And Judge Morales, he was a prosecutor in Las Vegas. And a trial judge. I never heard that phrase. But it's another thing. In the state of Oregon, is the conspiracy approach used in prosecuting criminal matters? It's that conspiracies are often charged. Are you talking about in the District of Oregon or in Federal court or the State? The State of Oregon. State courts in Oregon. From my anecdotal experience in State court, Your Honor, conspiracies are not often charged in State court. No, they're not often charged. No, it's primarily in Federal court. They're charged in Federal court. That's right, Your Honor. And I remember I was a trial judge in a Superior Court in California. And I don't ever remember any criminal matter that I ever handled. And we used to do about 1,000 a year that were charged conspiracy. So you only get it in the Federal court. Right. And it's a very dangerous weapon. And it has a very old, insidious history, too. And so that's why when you charge a conspiracy, you need to have everything nice and tight and be able to prima facie prove a conspiracy before you bring in the co-conspirator statement. You know all that. Yes, Your Honor. And that was done in this case. We had an offer of proof prior to trial where the district court found prima facie evidence of a conspiracy, and we were able to provisionally admit our co-conspirator statement. And the conspiracy was the appropriate charge in this case because, as I said, the defendant and his co-defendants, three of whom went to trial out of the ten who were originally charged, they had contacts with each other. So there was significant evidence presented to the jury and before the jury for them to find that the defendant conspired with the co-defendants named in the indictment and others that were listed as known and unknown to the grand jury. And if I may, I'll go through just four very brief examples of the defendant's contact with co-conspirators in this case. First, the defendant and his older brother, Ricardo, asked convicted co-conspirator Oscar Aguirre to rent a stash apartment so that the defendant could use one of the rooms in that apartment to weigh and to store his drugs. Mr. Aguirre pleaded guilty prior to trial, and he testified as a cooperator at trial that the defendant used the apartment for exactly that purpose, to weigh out his drugs. So the stash apartment is evidence of that. That door was locked, Your Honor, yes. And Mr. Aguirre did not have access to the second bedroom, but he was given money by the older brother, Ricardo, to set up that stash apartment. So that is evidence of jointly undertaken criminal activity by three members of the conspiracy, including the defendant. Second, as the Court noted, the defendant possessed the stash car, the Mazda. He had the windows tinted in the car. And then prior to the wiretap beginning in this case, he gave the car to Hector Villarreal, who was known as Guero in this case. This is the car that was seized by the police and was found to have very significant quantities of both heroin and methamphetamine hidden in the stash or secret compartment in that car. And then third, as again the Court noted, the day after the Mazda was seized by the police, the police acted out a ruse to lead the defendants to believe that the car was stolen to, I guess, in the investigative parlance, to tickle the wire. And there were significant and very important calls the day after the car was stolen   Ricardo Mendoza-Morales called each member of the conspiracy asking about the stolen car. As the Court noted, when the defendant ---- You noticed that none of these guys steals American-made cars. It wasn't the Mazda that was stolen. They used it. They used all types of different cars, Your Honor. Yeah. But we didn't steal the American car. The other car was what? The other car ---- there were five trapped cars in the case, Your Honor, and they all had similar latching mechanisms. And the defendant was known to use at least two of those five cars, Your Honor. And when the day after the Mazda was stolen, Ricardo called the defendant and asked him if he always went to the garage alone. The defendant says, yes, always alone. In very colorful language, he asked, you know, who the heck would I take with me. And the ---- very significantly, the defendant asked, Ricardo, why don't you check with Guerra or Hector? And this shows that the defendant knew that co-defendant, Villarreal, Hector, had access to the garage. The defendant was aware of the scope of the conspiracy, and this is another example of the defendant undertaking joint criminal activity with other members of the conspiracy. And fourth and finally, the evidence at trial show that the defendant distributed drugs to co-defendants Jose Salinas, and that was in Col. 364, and Omar Vasquez, who's known as Negro, whom the Court noted, and that he did so in connection with his older brother, Ricardo. Can I ask a question? Of course, Your Honor. Did you really need a conspiracy theory to convict Octavio? Did we need a conspiracy theory to convict him? I don't know that we needed a conspiracy, because there was sufficient evidence of Mr. Mendoza-Morales's personal liability with respect to the substantive counts, Your Honor. So I think that there was certainly sufficient evidence to convict the defendant of the substantive counts under both Pinkerton liability and personal liability. However, a conspiracy was an appropriate charge here, as shown by the defendant's knowledge of the scope of the conspiracy and his dependence on the overall benefits. Have you heard of a professor by the name of Michael Tigard? No, Your Honor. He's a very colorful guy. I haven't heard much from him recently. But he likes to write plays, and he wrote a play about conspiracy, according to him, based on history of conspiracy law, and it was performed at an ABA convention in San Francisco maybe 20, 25 years ago. It didn't go over very well, because most of the players were lawyers, and most of them were inebriated. So it was quite a thing to watch. But do you know why the British developed conspiracy law? I don't know the history of it, Your Honor, no. Well, they developed conspiracy law so they could keep down the Irish. So if two Irish got together and talked about some troubles, that would be a conspiracy. You should have been able to guess that. What? You should have been able to guess that one, that it was about the Irish. You should have been able to guess that. Yeah, and then Pinkerton. Do you know who Pinkerton was? He was a guy that was hired by mine owners to run around and beat up on mine workers in Montana, Idaho, and probably near Bend, Oregon. So it's kind of an infamous name in American history. Have you ever read, I think it's called The Citizens' History, or The People's History of the United States by Howard Zinn? I haven't, Your Honor, no. Well, you ought to get a copy. He died and a million copies have been sold. And they don't give you all this stuff. It's enlightening. I will look at it, Your Honor. I do believe that conspiracy was the appropriate charge here. And there was more than sufficient evidence, actually overwhelming evidence, for the jury to find that the defendant was a member of the charged conspiracy in this case. And as I stated, there was also ample evidence for the jury to find the defendant guilty of the substantive counts under both Pinkerton and personal liability. So unless the Court has any questions, we'll submit on the briefs. Thank you. Very briefly, Your Honor, thank you. I just want to address the bit about the stash apartment. Conceitedly, that is the government's best evidence of conspiracy, but I would encourage the Court to look back at the transcripts of Oscar Aguirre's trial testimony. That's where the evidence derives. What Mr. Aguirre testified was that he needed an apartment. He was approached by Ricardo. Ricardo said, would you like a place to stay? I will, in fact, pay your rent if you want to do that. I am going to get a second room, put a lock on it, so that when my brother Octavio can use that for our drug distribution business, if you will. And I don't want to – I am summarizing, Your Honor, so please look at the transcripts. But that's the substance of that transaction. I would suggest to the Court that that is, as I said, the government's best evidence of conspiracy. I believe that is a fairly weak thread upon which to hang a felony conviction and a 13-year sentence. Thank you. Thank you. The matter is submitted. We'll call, let's see, the next case, U.S. v. Robert Eugene Brewster. That's submitted. And now we come to Oregon Natural Desert Association, U.S. v. Buford. And we have Steves Mountain Landowners. Okay. Thank you.
judges: Pregerson, Wardlaw, Rawlinson